UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -x

PAULETTE HAMILTON <u>et al.</u>,                          :

                Plaintiffs,                  :

                        :

      - against -                              :

CITY OF NEW YORK and                                :
DR. SCOTT O'NEILL,

                  :

             Defendants.       :

- - - - - - - - - - - - - - - - - -x

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9-18-09
```

**OPINION**

06 Civ. 15405 (DC)

**APPEARANCES:**        BARRY D. HABERMAN, ESQ.
                      254 South Main Street, Suite 404
                      New City, New York  10956
                      Attorney for Plaintiffs

                      MICHAEL A. CARDOZO, ESQ.
                      Corporation Counsel of the City of New York
                          By:  Christopher A. Seacord, Esq.
                              Assistant Corporation Counsel
                      100 Church Street
                      New York, New York  10007

**CHIN, District Judge**

        Plaintiffs are four current and former employees of the New York City Police Department ("NYPD") Crime Laboratory (the "Crime Lab") who claim they were discriminated against based on their race and national origin and, as to two of the four, gender.  Specifically, plaintiffs claim they were denied promotions and demoted while promotions were given to less qualified Caucasian males who were born in the United States.  Defendants City of New York (the "City") and Dr. Scott O'Neill, plaintiffs' supervisor, deny that plaintiffs were discriminated against, and argue that the employees they promoted were indeed more qualified than plaintiffs.

Before the Court are defendants' motion for summary judgment dismissing the complaint, and plaintiffs' cross-motion for judgment in their favor as to one claim. Because a reasonable jury could not find that defendants discriminated against plaintiffs, defendants' motion for summary judgment is granted, plaintiffs' cross-motion is denied, and the case is dismissed.

## BACKGROUND

### A.  Facts

On a motion for summary judgment, the Court construes the evidence in the light most favorable to the non-moving party. Although plaintiffs have cross-moved for summary judgment on one claim, the Court construes the evidence in the light most favorable to plaintiffs.

The following facts are taken from the exhibits, affidavits, declarations, and deposition transcripts submitted by the parties:

### 1.  The Crime Lab

The Crime Lab is a subunit of the NYPD's Forensic Investigations Division ("FID").  (O'Neill Decl. ¶ 5).  It is divided into several different sections, each of which performs a different function.  Plaintiffs all worked for the Controlled Substance Analysis Section ("CSAS"), which is tasked generally with testing substances to determine whether they contain

- 2 -

controlled substances.  (Id. ¶ 10).  Employees of CSAS also
regularly testify in court regarding their findings.  (Id.).

Most employees in the Crime Lab are Criminalists, a
title that is divided into several assignment levels.
Criminalist I (A or B) and II are generally entry-level
positions, Criminalist III is generally a senior position, and
Criminalist IV is generally a supervisory position.  (Id. ¶ 12;
Seacord Decl. Ex. C (official NYPD description of Criminalist
duties)).

From 1997 to 2005, certain employees -- including
plaintiffs -- held the title of Criminalist III but were given
supervisory responsibilities, which is generally reserved for
Criminalist IVs.  (O'Neill Decl. ¶ 15).  They were referred to
within the NYPD as "Criminalist III-Supervisor," although that is
not a formal title within the Crime Lab.  Criminalist III-
Supervisors received the same salary and benefits as their
Criminalist III colleagues.  (Id.).

## 2.  **Relevant Crime Lab Employees**

### a.  **Plaintiff Paulette Hamilton**

Hamilton, a female, was born in Jamaica and
characterizes her race as "black."  (Hamilton Dep. at 7; Compl. ¶
33).  She held a master's degree[1] and began working for the NYPD
as a Chemist Trainee in 1984.  (Hamilton Dep at 7; Seacord Decl.

---

[1]     Unless provided herein, the parties do not provide the
Court with details regarding educational backgrounds.

Ex. GG).[2]  In 1985 she was promoted to Assistant Chemist, where her job responsibilities included testing materials to determine whether they contained controlled substances.  (Hamilton Dep at 7; O'Neill Decl. ¶ 10).  In early 1999 the title of Hamilton's position was changed to Criminalist III, but she performed the same duties she had performed as an Assistant Chemist.  (Hamilton Dep. at 10).  In September 1999 Hamilton assumed the position of Criminalist III-Supervisor.  (Id.).  Her salary and benefits did not change, but she did supervise other Criminalists, which she had not done before.  (Id. at 11-12).  According to Hamilton and the other plaintiffs, she should have been paid at the same rate as the Criminalist IVs, as she was performing the same work.

Hamilton received an overall rating of "Meets Standards" on her evaluations for the years 2002-2003, 2003-2004, and 2004-2005, and "Above Standards" for the years 2000-2001, and 2005-2006.  (Seacord Decl. Exs. GG-KK).  O'Neill only reviewed Hamilton for the year 2003-2004.  (Id. Ex. II).  Hamilton's evaluations were generally positive, but do contain criticism, including the following:[3]

- "Crim III Hamilton communication skills could be improved upon."  (Id. Ex. HH).

---

[2]  Prior to 1997 many employees in the Crime Lab held titles other than Criminalist.  Beginning in 1997 the other titles were phased out and all employee titles were conformed to the Criminalist classifications.  (O'Neill Decl. ¶ 11).

[3]  All errors in employee evaluations quoted in this decision were in the originals.

■       "Ratee does need to be more pro active in
        identifying issues concerning the section.  Ratee
        needs to consider solutions to problems in the
        section on a supervisory level.  Ratee needs to
        actively participate in discussions concerning
        section policy."  (Id. Ex. II).

Hamilton died on February 1, 2007.  (Pl. Statement ¶
127).  Her estate was substituted as a plaintiff by stipulation
and order dated May 30, 2007.

### b.  **Plaintiff Gamal Hanna**

Hanna, a male, was born in Egypt and characterizes his
race as "non-Caucasian."  (Hanna Aff. ¶¶ 5-9).  He holds a
bachelor's degree and began working for the NYPD as a Chemist
Trainee in 1988.  (Id.; Seacord Decl. Ex. LL).  In 1990 he was
promoted to Assistant Chemist.  (Hanna Aff. ¶ 10).  On August 10,
2000, Hanna's title changed to Criminalist III, but his duties
remained the same.  (Hanna Dep. at 34).  In July 2003 Hanna
assumed the position of Criminalist III-Supervisor.  (Hanna Aff.
¶ 12).

Hanna received an overall rating of "Above Standards"
on his evaluations for the years 2001-2002, 2002-2003, and 2005-
2006, and a rating of "Meets Standards" for the years 2003-2004,
2004-2005, and 2006-2007.  (Seacord Decl. Exs. LL-QQ).  O'Neill
only reviewed Hanna for the year 2003-2004.  Hanna's evaluations
were generally positive, but do contain criticism, including the
following:

- "Ratee does need to be more pro active in identifying issues concerning the section. Ratee should have a more visible supervisory presence in the section." (Id.).
- "Ratee should show initiative in willing to accept more responsibility." (Id. Ex. QQ).

## c.  **Plaintiff Nivine Elsharouny**

Elsharouny, a female, was born in Egypt and characterizes her race as "non-Caucasian." (Elsharouny Aff. ¶¶ 5-8). She holds a bachelor's degree and began working for the NYPD as a Chemist Trainee in 1990. (Id.; Seacord Decl. Ex. RR). In March 1991, she was promoted to Assistant Chemist, and on March 12, 2001, her title was changed to Criminalist III. (Elsharouny Aff. ¶¶ 9-10). In March 2004, she assumed the position of Criminalist III-Supervisor. (Id. ¶ 11).

Elsharouny received an overall rating of "Meets Standards" on her evaluations for the years 2001-2002, 2002-2003, 2003-2004, and 2004-2005, and a rating of "Above Standards" for the period from September 2003 to March 2004 and for the year 2005-2006. (Seacord Decl. Exs. RR-XX). O'Neill only reviewed Elsharouny for the period from September 2003 to March 2004, and the year 2003-2004. Elsharouny's evaluations were generally positive, but she received the following criticism in her 2002-2003 evaluation: "On occasion, criminalist makes errors and becomes overly defensive and frustrated when confronted." (Id. Ex. SS).

- 6 -

### d.  **Plaintiff Subhash Naik**

Naik, a male, was born in India and characterizes his
race as "non-Caucasian."  (Naik Aff. ¶¶ 6-9).  He holds a
master's degree and began working for the NYPD in 1980 as a
Junior Chemist.  (Id. ¶ 7; Seacord Decl. Ex. AA).  He received
the following promotions:  Assistant Chemist in 1981; Associate
Chemist I in 1986; and Associate Chemist I-Supervisor in 1996.
(Naik Aff. ¶¶ 10-12).  In 1997 he assumed the position of
Criminalist III-Supervisor.  (Id. ¶ 13).

From 2001 through 2007, Naik received an overall rating
of "Meets Standards" on his evaluations.  (Seacord Decl. Exs. AA-
FF).  O'Neill only reviewed Naik for the period 2003-2004.  Naik's
evaluations were generally positive, but do contain criticism,
including the following:

- "Naik needs to be more pro-active and needs to
  show more initiative in area of problem solving."
  (Id. Ex. AA).
- "Crim III Naik verbal and written communication
  skills could be improved upon."  (Id. Ex. BB).
- "Ratee [Naik] needs to communicate more with
  supervisor and colleagues to share his knowledge
  of controlled substances and results from his
  experimentation."  (Id. Ex. DD).
- "Ratee must work to improve upon his time
  management skills with regards to casework."  (Id.
  Ex. EE).

- 7 -

### e.  **Defendant Dr. Scott O'Neill**

O'Neill, a male, was born in Scotland.  (O'Neill Decl. ¶
3).  He holds a doctorate in chemistry from the University of
Strathelyde in Scotland and began working for the NYPD in 1998 as
a Criminalist II in CSAS.  (O'Neill Decl. ¶¶ 4-5).  He received a
series of promotions, and by April 2004 assumed the role of
Managerial Criminalist II, in which role he directly supervised
plaintiffs.  (Id. ¶¶ 6, 7, 21).  On February 24, 2006 O'Neill was
promoted to Deputy Director of the Crime Lab, the position he
currently holds.  (Id. ¶ 9).

### f.  **Comparators**

Plaintiffs have identified three Crime Lab employees
who were promoted over plaintiffs, or considered for promotion
over plaintiffs, despite the fact that they were purportedly less
qualified than plaintiffs.

### i.  **Dr. Vito Casella**

Casella, a male, was born in Italy.  (Casella Dep. at
45).  He holds a doctorate and began working in the Crime Lab in
1998.  (Id.; Seacord Decl. Ex. O).  Casella assumed the position
of Criminalist III-Supervisor in approximately November 2003.
(Id. at 14).

From 2000 through 2005, Casella received an overall
rating of "Above Standards" on his evaluations, with the
exception of 2003-2004, when he received a rating of "Well Above

- 8 -

Standards." (Seacord Decl. Exs. 0-R). There are no negative comments or criticisms in any of Casella's evaluations.

## ii. **Matthew Johnson**

Johnson, a male born in the United States, began working in the Crime Lab in 1998, and assumed the position of Criminalist III-Supervisor in 2003. (O'Neill Decl. ¶ 30). He holds a master's degree. (Seacord Decl. Ex. S).

From 2001 through 2005, Johnson received an overall rating of "Above Standards" on his evaluations, with the exception of 2003-2004, when he received a rating of "Well Above Standards." (Seacord Decl. Exs. S-V). O'Neill reviewed Johnson for the years 2003-2004 and 2004-2005. Johnson's evaluations were positive; the only criticism he received was in his 2004-2005 evaluation, when he was criticized for taking on too much work: "Ratee's major weakness is the amount of work he undertakes does negatively impact on some of the projects being completed in a timely manner." (Id. Ex. V).

## iii. **Thomas Hickey**

Hickey, a male born in the United States, holds a bachelor's degree and worked for several years as a Criminalist III-Supervisor.[4] (O'Neill Decl. ¶ 49; Seacord Decl. Ex. W). He was also a union delegate for several years, and through that job

---

[4] The record does not reveal when Hickey began working at the Crime Lab. For the purposes of this decision, the Court will assume Hickey is not as senior as any plaintiff.

- 9 -

had established relationships with many of the Criminalists in CSAS.  (O'Neill Decl. ¶ 49).

From 2001 through 2005, Hickey received an overall rating of "Above Standards" on his evaluations, with the exception of 2003-2004, when he received a rating of "Well Above Standards."  (Seacord Decl. Exs. W-Z).  O'Neill reviewed Hickey for the years 2003-2004 and 2004-2005.  Hickey's evaluations were mostly positive.  The only criticisms were that he was too close to his subordinates:

- ■ "Ratee has performed extremely well at a supervisory level however ratee needs to consider the complications in motivating individuals through friendship and not through supervisory role."  (Id. Ex. Y).

- ■ "Ratee must stay vigilant to the problems of having a close relationship with subordinates and should now use his position of Criminalist IV as a starting point to create an appropriate distance." (Id. Ex. Z).

### 3.  2005 Promotions

In 2005 two new Criminalist IV positions were created in CSAS.  O'Neill, as the manager, and consistent with Crime Lab practice and procedure, was responsible for selecting the two candidates.  (Id. ¶¶ 28-29).  Employees were not notified that they could apply for these positions, nor were interviews

conducted.  (Id. ¶ 29).  O'Neill did not consider seniority in
choosing candidates for promotion.  (Id.)

O'Neill believed that Criminalist III-Supervisors
Casella and Johnson were the best candidates, based on O'Neill's
experience working with them.  (Id. ¶¶ 30-31).  Casella was
O'Neill's first choice due to Casella's education, work
experience, attitude, and drive to constantly improve CSAS.  (Id.
¶ 31).  O'Neill was also very impressed with Johnson, whose
performance O'Neill describes as "excellent."  (Id. ¶ 32).

O'Neill offered the job to Casella, but Casella
declined, stating that the position would be too much of a
burden.  (Casella Dep. at 12).  Casella recommended Johnson for
the position, and Johnson later accepted the job.  (Id.).

O'Neill's back-up for the remaining position was Hickey.
O'Neill had observed Hickey for years and believed he
consistently performed above expectations and displayed
initiative.  (Id. ¶¶ 33-34).  He also noted that, during the
previous year, Hickey was in charge of training new Criminalists
and had done an excellent job.  (Id. 33).  O'Neill offered the
position to Hickey, and Hicky accepted.  (Id. ¶¶ 32-33, 43).

O'Neill considered plaintiffs for the promotion, but
did not believe any of them were right for the promotion, for the
following reasons:

> ■ While O'Neill believed that Naik was a hard
> worker, he simply did not believe he had the
> skills necessary to be an effective supervisor.

For example, O'Neill felt that Naik "was not
assertive and did not take the initiative to try
to improve the performance of his subordinates."
(<u>Id.</u> ¶ 36).

- O'Neill did not believe Hamilton was an effective
supervisor because she failed to take initiative
in suggesting improvements to CSAS.  O'Neill's
impression was that she "seemed content with
simply maintaining the status quo."  (<u>Id.</u> ¶ 37).

- O'Neill felt that Hanna had major weaknesses,
including a lack of initiative, an inability to
delegate responsibility, and a failure to correct
subordinates' performance issues.  As to the
latter weakness, O'Neill pointed out that, in many
instances, Hanna would simply take it upon himself
to correct problems rather than teach a
subordinate how to avoid such problems in the
future.  (<u>Id.</u> ¶¶ 39-40).

- O'Neill did not believe Elsharouny would make an
effective supervisor because he had received a
number of complaints about her management style.
O'Neill felt that "Elsharouny often used poor
judgment in dealing with the individuals under her
supervision, and, therefore, determined that she
was not the best candidate for the position of
Criminalist IV at that time."  (<u>Id.</u> ¶ 41).

- 12 -

Following the promotion of Johnson and Hickey, there were nine Criminalist IVs in CSAS with the following gender and national origin breakdown:  Four males born in India; one male born in Pakistan; one female born in India; one female born in China; and two males born in the United States.  (Id. ¶ 48).

### 3.  **Elimination of the Criminalist III-Supervisor Position**

After Johnson and Hickey were promoted, there were five individuals with the title Criminalist III-Supervisor -- plaintiffs and Casella.  (Id. ¶ 45).  With the creation of the new Criminalist IV positions, O'Neill determined that an appropriate span of control ratio -- a management concept regarding how many employees a manager supervises -- existed and it would no longer be necessary to assign employees to the Criminalist III-Supervisor position.  (Seacord Decl. Ex. BBB (May 9, 2005 memo from O'Neill)).  Dr. Peter Pizzola, the Acting Director of the FID, and Denis McCarthy, the Deputy Chief of FID, both approved the change.  (Id.).

On May 13, 2005, O'Neill met with plaintiffs and Casella and informed them that they would no longer be working as supervisors.  (O'Neill Decl. ¶ 46).[5]  Plaintiffs' salaries and benefits did not change.  O'Neill subsequently held meetings with all CSAS Criminalists to inform them of the change in

_____

[5]      It is not clear whether O'Neill told plaintiffs during this meeting that he did not believe they were supervisor material.  According to Pizzola, O'Neill told Pizzola that O'Neill had said that during the meeting with plaintiffs, but plaintiffs do not appear to claim that O'Neill did.

- 13 -

responsibilities. (Id. ¶ 47). The purpose of these meetings was to assure CSAS employees that the change was not based on the performance of the Criminalist III-Supervisors, but rather on the fact that an appropriate span of control ratio had been achieved. (Id. ¶ 47).

### 4. **Plaintiffs' Grievance**

On May 13, 2005, plaintiffs filed a grievance through their union, alleging that they had been working out of title and should be compensated at the rate of a Criminalist IV. (Seacord Decl. Ex. CCC (grievance)). The grievance was ultimately denied for technical reasons not relevant to this case. (Id. Ex. EEE). Plaintiffs did not appeal the denial of their grievance. (Naik Dep. at 51).

### 5. **The OEEO Complaint**

On May 16, 2005, plaintiffs Hanna, Hamilton, and Elsharouny filed a complaint against O'Neill with the NYPD's Office of Equal Employment Opportunity ("OEEO"), claiming they were denied promotions to Criminalist IV based on their national origin. (Seacord Decl. Ex. FFF). The claim was investigated, and deemed unfounded, because the investigator's review of the evidence revealed that Johnson's and Hickey's evaluations were, on average, better than the complaining plaintiffs' evaluations. (Id. Ex. GGG).

During the course of the investigation, the OEEO interviewed FID Deputy Director Peter Pizzola, who said that he believed plaintiffs should have been paid at the Criminalist IV

- 14 -

rate, because that was essentially the work they were performing.
(Haberman Aff. Ex. 10 at 14-16). Pizzola also said that O'Neill
had told him that O'Neill did not believe plaintiffs were "well
suited to be supervisors." (Id. at 16).

## 6. **The EEOC Complaint**

On January 19, 2006, plaintiffs filed charges of
employment discrimination with the Equal Employment Opportunity
Commission ("EEOC"). Naik and Hanna alleged discrimination on
the basis of race and national origin, and Hamilton and
Elsharouny alleged discrimination on the basis of race, national
origin, and gender. (Seacord Decl. Exs. JJJ, KKK, LLL, MMM).
The EEOC conducted an investigation, and on July 17, 2006 issued
four determinations, concluding that plaintiffs were
discriminated against on the basis of national origin, and making
no determination as to whether they were discriminated against on
the basis of race or gender. (Id. Exs. NNN, OOO, PPP, QQQ).
These determinations were based on the investigator's conclusion
that Johnson and Hickey did not appear to be better qualified or
have greater seniority than plaintiffs. (See, e.g., id. ex. NNN
("Investigation fails to show that the two white American males
were better qualified or had greater seniority than Charging
Party.")).

## 7. **2007 CSAS Promotion**

In January 2007 a Criminalist IV position opened up in
CSAS. (Hickey Decl. ¶ 3). For these promotions, O'Neill and
others felt that the process should be more transparent so as to

- 15 -

"prevent unsuccessful candidates from feeling as if they were unfairly passed over for promotion." (O'Neill Decl. ¶ 55). Accordingly, the positions were posted, and interested applicants were required to submit a resume and writing sample to apply, then take part in an interview. (Id. ¶¶ 54-55; Hickey Decl. ¶ 3). Interviews were conducted in March and April of that year by a panel of five employees, with the following gender and national origin breakdown: One male born in the United States, two females born in China, one male born in India, and one female born in India. (Hickey Decl. ¶ 4). The panel interviewed fourteen employees for the position, including plaintiffs Elsharouny, Naik, and Hanna. (Id.). During these interviews the panel rated the candidate's answers to ten questions on a scale from one to five. (Id. ¶ 5). Following these interviews, four employees were referred to the next round; Robert Connor, a Caucasian male born in the United States, was ultimately chosen for the position. (Id. ¶ 10).

According to Hickey, one of the interviewers, plaintiffs were not selected for the second interview because they did not perform as well at the interview as the candidates who were selected to move on. (Id. ¶¶ 7-9). Specifically, Hickey recalls that Elsharouny refused to respond to a question asking how she would respond if a subordinate accused her of treating him unfairly, and simply stated that she would never treat a subordinate unfairly; the interviewers found her non-response to be odd and evasive. (Id. ¶ 9).

- 16 -

**8.   2007 Trace Unit Promotion**

In   January 2007 a Criminalist IV position opened up in the Crime Lab's Trace Unit.  (Eng Decl. ¶ 3).  Candidates for the position were interviewed in March and April of that year by a panel with the following gender and national origin breakdown: One female born in China, one female born in the United States, two males born in the United States, and one female born in India.  (Id. ¶ 4).  Six applicants were interviewed, including plaintiff Naik.  (Id. ¶ 5).  Naik was not one of the applicants selected for a second interview.  Ultimately an African-American female was chosen for the position.  (Id. ¶ 7).

According to Eng, one of the interviewers, Naik was not selected for a second interview because he "exhibited a woefully deficient understanding of the nature of the Trace Unit and the work performed therein."  (Id. ¶ 6).

**9.   2008 Promotion**

In March 2008 a Criminalist IV position opened up in the Quality Assurance section of the Crime Lab.  (Id. ¶ 12). Four candidates applied, including plaintiff Naik.  (Id.).   They were interviewed by a panel with the following gender and national origin breakdown:  One male born in the United States, two females born in China, one male born in India, and Sergeant Anthony Pignataro, whose gender and national origin are not identified.  (Id. ¶ 12).  The panel recommended two candidates for a second interview, and Allaishaw Hill, a female born in Guyana, was ultimately chosen for the position.  (Id. ¶¶ 12-13).

- 17 -

According to Eng, one of the interviewers, Naik was not selected because he "exhibited a less than adequate understanding of the function of the Quality Assurance Section and the requirements of the supervisor position."  (Id. ¶ 13).

## B.  **Procedural History**

Plaintiffs filed their complaint in New York state court on August 9, 2006.  Defendants removed the case on December 20, 2006.  Plaintiffs amended their complaint on March 13, 2007, and again on October 25, 2007.

The second amended complaint asserts the following claims:  (1) Discrimination based on plaintiffs' demotions under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., 42 U.S.C. § 1983, the New York State Human Rights Law ("SHRL"), the New York City Human Rights Law ("CHRL"), the New York City Administrative Code §§ 8-101 et seq.,; (2) discrimination based on failure to promote under the same statutes; (3) a claim for retaliation under the same statutes; (4) a due process claim under 42 U.S.C. § 1983; (5) a claim against the City under Monell v. Department of Social Services, 436 U.S. 658 (1978); and (6) a claim under the New York State Labor Law §§ 190 et seq.  Plaintiffs seek damages, including punitive damages, back pay, front pay, and recovery of lost fringe benefits.

Discovery ensued, and these motions followed.

## DISCUSSION

I begin with a discussion of the standard applicable to a motion for summary judgment. I then address plaintiffs' discrimination claims, and conclude that no reasonable jury could find that defendants discriminated against plaintiffs. Addressing the due process claim, I conclude that plaintiffs have abandoned it, as they did not address the claim in their opposition to defendants' motion for summary judgment. Next I discuss the Monell claim, and conclude that it must be dismissed as there is no evidence of a constitutional violation. Finally, I discuss plaintiffs' New York Labor Law Claim, and conclude that it does not apply to municipal agencies.

### A. Summary Judgment Standard

The standards governing motions for summary judgment are well-settled. A court may grant summary judgment only where there is no genuine issue of material fact and the moving party is therefore entitled to judgment as a matter of law. See Fed R. Civ. P. 56(c); accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986). Summary judgment should be denied "if the evidence is such that a reasonable jury could return a verdict" in favor of the non-moving party. See NetJets Aviation, Inc. v. LHC Commc'ns, LLC, 537 F.3d 168, 178-79 (2d Cir. 2008). In deciding a motion for summary judgment, the court must construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in the non-moving party's favor. In re "Agent Orange" Prod. Liab. Litig.,

- 19 -

517 F.3d 76, 87 (2d Cir. 2008). The non-moving party cannot, however, "escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, or defeat the motion through mere speculation or conjecture." W. World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir. 1990) (internal citations and quotations omitted).

In deciding a motion for summary judgment, the role of the court is not to ask whether "the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). Because the court's role is limited in this respect, it may not make factual findings, determine credibility of witnesses, or weigh evidence. See Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005); Hayes v. New York City Dep't of Corr., 84 F.3d 614, 619 (2d Cir. 1996); United States v. Rem, 38 F.3d 634, 644 (2d Cir. 1994).

## B. Discrimination Claims

Plaintiffs advance three discrimination claims. First, they claim they were discriminated against when they were not promoted in 2005, 2007, and/or 2008. Second, they claim they were discriminated against when they were demoted from Criminalist III-Supervisors to Criminalist IIIs. Finally, they claim they were retaliated against for reporting defendants' discrimination.

- 20 -

## 1.   **Applicable Law**

Employment discrimination claims brought under 42 U.S.C. § 1983, the SHRL, and the CHRL are analyzed under the same framework as claims brought under Title VII.  See Gant v. Wallingford Bd. of Educ., 195 F.3d 134, 146 (2d Cir. 1999); Norville v. Staten Island Univ. Hosp., 196 F.3d 89, 95 (2d Cir. 1999); Song v. Ives Labs., Inc., 957 F.2d 1041, 1046 (2d Cir. 1992).

The "ultimate issue" in any employment discrimination case is whether the plaintiff has met her burden of proving that the adverse employment decision was motivated at least in part by an "impermissible reason" -- i.e., that there was discriminatory intent.  See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 146 (2000); Fields v. N.Y. State Office of Mental Retardation & Dev'l Disabilities, 115 F.3d 116, 119 (2d Cir. 1997).

In the absence of direct evidence of discrimination, a plaintiff in an employment discrimination case usually relies on the three-step McDonnell Douglas test.  First, a plaintiff must establish a prima facie case of unlawful discrimination by showing that (1) she is a member of a protected class (2) who performed her job satisfactorily (3) but suffered an adverse employment action (4) under circumstances giving rise to an inference of discrimination.  See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 & n.13 (1973) (noting that elements of prima facie case vary depending on factual circumstances);

Stratton v. Dep't for the Aging, 132 F.3d 869, 879 (2d Cir. 1997).

For a failure to promote claim, the prima facie case is somewhat different. There a plaintiff must prove that (1) she is a member of a protected category, (2) she applied for an available position, (3) she was qualified for the position, and (4) she was rejected under circumstances that give rise to an inference of discrimination. Cruz v. Coach Stores, Inc., 202 F.3d 560, 565 (2d Cir. 2000); De La Cruz v. N.Y. City Human Resources Admin. Dep't of Soc. Servs., 82 F.3d 16, 20 (2d Cir. 1996).

If the plaintiff establishes a prima facie case of discrimination, "a rebuttable presumption of discrimination arises and the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the employment decision." Stratton, 132 F.3d at 879; see Reeves, 530 U.S. at 142-43.

If the employer articulates a nondiscriminatory reason for its actions, the presumption of discrimination is rebutted and it "simply drops out of the picture." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-11 (1993) (citation omitted); see James v. N.Y. Racing Ass'n, 233 F.3d 149, 154 (2d Cir. 2000). The burden then shifts back to the plaintiff to show, without the benefit of any presumptions, that more likely than not the employer's decision was motivated, at least in part, by a

discriminatory reason. See Fields, 115 F.3d at 120-21; Connell
v. Consol. Edison Co., 109 F. Supp. 2d 202, 207 (S.D.N.Y. 2000).

To meet this burden, the plaintiff may rely on evidence
presented to establish his prima facie case as well as additional
evidence, which may include direct or circumstantial evidence of
discrimination. Desert Palace, Inc. v. Costa, 539 U.S. 90, 99-
101 (2003); Harris v. City of N.Y., No. 03 Civ. 6167 (DLC), 2004
WL 2943101, at *2 (S.D.N.Y. Dec. 21, 2004). It is not
sufficient, however, for a plaintiff merely to show that she
satisfies "McDonnell Douglas's minimal requirements of a prima
facie case" and to put forward "evidence from which a factfinder
could find that the employer's explanation . . . was false."
James, 233 F.3d at 157. Instead, the key is whether there is
sufficient evidence in the record from which a reasonable trier
of fact could find in favor of plaintiff on the ultimate issue --
that is, whether the record contains sufficient evidence to
support an inference of discrimination. See id.; Connell, 109 F.
Supp. 2d at 207-08.

As the Second Circuit observed in James, "the way to
tell whether a plaintiff's case is sufficient to sustain a
verdict is to analyze the particular evidence to determine
whether it reasonably supports an inference of the facts
plaintiff must prove -- particularly discrimination." 233 F.3d
at 157; see Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708,
714 (2d Cir. 1996) (to defeat summary judgment, plaintiff is
obliged not just to produce "some" evidence, but must produce

sufficient evidence to support a rational jury verdict in his
favor); Lapsley v. Columbia Univ., 999 F. Supp. 506, 513-16
(S.D.N.Y. 1998) (advocating elimination of McDonnell Douglas test
in favor of simplified approach focusing on ultimate issue of
whether sufficient evidence exists to permit jury to find
discrimination); see also Norton v. Sam's Club, 145 F.3d 114, 118
(2d Cir. 1998) ("The thick accretion of cases interpreting this
burden-shifting framework should not obscure the simple principle
that lies at the core of anti-discrimination cases.  In these, as
in most other cases, the plaintiff has the ultimate burden of
persuasion.").

## 2. Application

For the reasons that follow, I conclude that no
reasonable jury could find that defendants discriminated against
plaintiffs.

### a. Failure to Promote[6]

I assume for purposes of this motion that plaintiffs
have made a prima facie showing of discrimination on the basis of
race, national origin, and gender.  Defendants have met their
burden of articulating a non-discriminatory reason for their
failure to promote plaintiffs.  See Stratton, 132 F.3d at 879;
see also Reeves 530 U.S. at 142-43.  Simply put, defendants
contend that they promoted other employees over plaintiffs

---

[6]     Plaintiffs claim discriminatory failure to promote
based on a number of different promotions  I consider their
failure to promote claims together, however, because plaintiffs'
and defendants' arguments are the same as to each promotion.

because (1) those employees promoted had better evaluations, (2) O'Neill felt, based on subjective and objective criteria, that they would make excellent Criminalist IVs, and (3) where applicable, they performed better at their interviews than plaintiffs.

Accordingly, I proceed directly to the ultimate question of whether plaintiffs have presented sufficient evidence from which a reasonable jury could find that they were discriminated against because of their race, national origin, and gender. I do so by evaluating first plaintiffs' evidence, then defendants' evidence, and finally the record as a whole, keeping in mind the elusiveness of proof of discrimination and the principle that the jury is "entitled to view the evidence as a whole." Stern v. Trs. of Columbia Univ., 131 F.3d 305, 314 (2d Cir. 1997); see also Siano v. Haber, 40 F. Supp. 2d 516, 520 (S.D.N.Y.), aff'd mem., 201 F.3d 432 (2d Cir. 1999).

### i.  **Plaintiffs' Evidence**

Plaintiffs offer the following evidence in support of their failure to promote discrimination claim:

First, when the 2005 promotions were made, there were seven Criminalist III-Supervisors, only two of whom were Caucasian males born in the United States.  Those two employees were promoted, while the foreign-born employees -- two of whom were also female -- were demoted.

Second, plaintiffs had more seniority than the employees promoted.

Third, O'Neill told Pizzola that plaintiffs were not "well suited to be supervisors," and O'Neill also stated that plaintiffs would never be supervisors. (Haberman Aff. Ex. 10 at 16).[7]

Fourth, as to the 2007 promotion, although Naik, Hanna, and Elsharouny applied for the job, ultimately a Caucasian male born in the United States was selected.

Plaintiffs offer three other pieces of evidence, which I conclude are not admissible.

First, the EEOC issued determinations concluding that all four plaintiffs had been discriminated against based on national origin. (Seacord Decl. Exs. NNN, OOO, PPP, QQQ). I exercise my discretion and decline to consider these determinations as evidence of discrimination. Cf. Green v. Harris Publ'ns, Inc., 331 F. Supp. 2d 180, 191 (S.D.N.Y. 2004) ("The consideration, if any, to be given to EEOC findings is within the sound discretion of the trial judge.") (citing Paolitto v. John Brown E.&C., 151 F.3d 60, 65 (2d Cir. 1998)). The EEOC determinations are based entirely on the investigators' conclusion that Hickey and Johnson were not better qualified than plaintiffs, and that they were not more senior. The determinations do not cite to any evidence to support this conclusion, nor do they even acknowledge evidence inconsistent with the conclusion -- namely, the performance evaluations.

---

[7]     It is not clear to the Court whether O'Neill told plaintiffs directly that they would never become supervisors, or if they heard this from Pizzola.

- 26 -

Moreover, even assuming the EEOC was correct that the employees promoted over plaintiffs were not more qualified, the determinations do not cite any evidence of discrimination. Because they are deficient in these respects, I decline to consider the EEOC determinations as evidence of discrimination.[8]

Second, plaintiffs allege that O'Neill told plaintiffs that he wanted to "change the face" of the Criminalist III-Supervisors. (Naik Aff. ¶ 55; Hanna Aff. ¶ 54; Elsharouny Aff. ¶ 50). The Court will not consider this evidence, however, because it is submitted in the form of affidavits that directly contradict plaintiffs' deposition testimony. Cf. Mack v. United States, 814 F.2d 120, 124 (2d Cir. 1987) ("It is well settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment."). In their affidavits, plaintiffs Naik, Hanna, and Elsharouny claim -- in the exact same words -- that O'Neill stated he wanted to "change the face" of the Criminalist III-Supervisors. These affidavits directly contradict their deposition testimony. Each of these three plaintiffs was asked in deposition whether O'Neill -- or any other NYPD employee -- ever made any statements to suggest he was motivated by discrimination, and they all responded in the negative. (Hanna Dep. at 116; Naik Dep. at 61; Elsharouny Dep. at 82).

---

[8]    I also decline, for similar reasons, to consider the OEEO's determination that plaintiffs' claims were unfounded.

Accordingly, I do not consider these affidavits as evidence of discrimination.

Third, after the 2005 promotions, defendants changed their practices, and began posting new positions so that any interested applicant could apply, which plaintiffs argue is evidence that defendants knew their previous practices were discriminatory and unfair. I will not consider this evidence as evidence of discriminatory intent, because it constitutes a subsequent remedial measure under Federal Rule of Evidence 407. See Dennis v. County of Fairfax, 55 F.3d 151, 154-55 (4th Cir. 1995) (referring to "misapprehension" that "corrective action by an employer amounts to a concession that discrimination actually took place" and discussing policy reasons why courts should not consider such evidence in discrimination cases); Stahl v. Bd. of County Comm'rs, No. 03-3068, 101 Fed. Appx. 316, 321 (10th Cir. 2004) (affirming district court's decision to exclude, under 407, fact that defendant suspended test that was subject of plaintiff's discrimination suit).

### ii. **Defendants' Evidence**

Defendants offer the following evidence in support of their motion for summary judgment:

First, the two employees who were promoted over plaintiffs in 2005 had, on average, better evaluations than plaintiffs.[9] All of Johnson's and Hickey's evaluations gave them

---

[9]     Plaintiffs argue that any evaluation performed by O'Neill is biased or tainted, but they cannot argue around the

- 28 -

an overall rating of "Above Average" or "Well Above Average." They never received a single rating as low as "Meets Standards." Plaintiffs, by contrast, did not have such high ratings. Most of Hamilton's (60%), Elsharouny's (66%), and Saik's (100%) ratings were "Meets Standards," and 50% of Hanna's were "Meets Standards."[10]

Second, for those promotions where interviews were conducted -- 2007 and 2008 -- defendants state under oath that they chose other employees over plaintiffs because plaintiffs did not perform as well at the interview.

Third, O'Neill's first choice for the promotion was Casella, who was born in Italy.[11]

Fourth, O'Neill also was not born in the United States.

---

fact that O'Neill's evaluations were always consistent with other evaluators.

[10] Though not argued by the parties, I note that the relevant educational backgrounds are a wash in terms of proving who was more qualified. Two of the plaintiffs have master's degrees and two have bachelor's degrees. Of the comparators, one has a doctorate, one has a master's, and one has a bachelor's.

[11] Plaintiffs attempt to make a disputed issue of fact out of this by pointing out that, during his interview with the OEEO investigator, Pizzola stated that O'Neill had told him Casella was not supervisory material. (Haberman Aff. Ex. 10 at 15-18). This statement is hearsay, as it is offered to prove that O'Neill did not believe Casella was supervisor material, and the Court cannot consider hearsay on a motion for summary judgment. In any event, in his deposition in this case Pizzola made clear that he misspoke during the OEEO interview. (Pizzola Dep. at 44-48). O'Neill has also submitted a sworn declaration stating that Casella was his first choice for the job. Accordingly, there is no disputed issue of fact as to whether Casella was O'Neill's first choice for the job.

Fifth, Johnson and Hickey were the first Caucasian and American-born Criminalist IVs.

Sixth, before Johnson and Hickey were promoted to Criminalist IV, every single Criminalist IV was born outside the United States, and both before and after the promotions at issue, a number of Crime Lab supervisors were foreign-born.

Seventh, in 2007 and 2008 three people were promoted to Criminalist IVs in the Crime Lab: One Caucasian male born in the United States, one African-American female, and one female born in Guyana.[12]

### iii.  The Record As a Whole

Considering the record as a whole, and resolving all conflicts in evidence and drawing all reasonable inferences in plaintiffs' favor, I conclude that no reasonable jury could find that plaintiffs' race, national origin, or gender were motivating factors in defendants' failure to promote them. While it is true that defendants promoted two Caucasian, American-born men while plaintiffs -- all non-Caucasian and foreign-born -- were demoted, upon closer inspection plaintiffs' claims of discrimination fail as a matter of law.

First, no reasonable jury could conclude that the employees promoted over plaintiffs were less qualified than plaintiffs. It is undisputed that Johnson and Hickey had objectively and substantially better evaluations than plaintiffs.

---

[12]    The record does not identify the national origin of the African-American female or the race of the woman born in Guyana.

Moreover, the criticisms Johnson and Hickey received in their evaluations were minor compared to the criticisms plaintiffs received. While plaintiffs had more seniority, obviously seniority by itself does not make one employee more qualified than another. Work performance, as reflected in evaluations, is also relevant.

Second, the record shows that defendants did not promote plaintiffs after 2005 because of their poor performances at interviews. Defendants were entitled to make employment decisions based on an individual's performance at an interview. See Gavigan v. Clarkstown Cent. Sch. Dist., 84 F. Supp. 2d 540, 548 (S.D.N.Y. 2000) (holding that "defendant's claim that plaintiff, during her interview, appeared to lack certain interpersonal skills required for the position, and that the successful applicant had these skills, is enough to rebut plaintiff's prima facie case" of discrimination); Wechsler v. R D Mgmt. Corp., 861 F. Supp. 1153, 1160 (E.D.N.Y. 1994) ("[A]n unsuccessful performance at a job interview, wherein the applicant fails to convince the prospective employer that he or she is capable of handling the responsibilities of the job, is a legitimate, non-discriminatory reason which adequately rebuts a Title VII plaintiff's prima facie case."). Plaintiffs have submitted no evidence to raise an issue of fact as to whether defendants' stated reason was pretextual.

Third, the fact that O'Neill himself was not born in the United States is some evidence that he was unlikely to be

- 31 -

biased against people not born in the United States. See Rinsler v. Sony Pictures Entm't, Inc., No. 02 Civ. 4096 (SAS), 2003 U.S. Dist. LEXIS 14754, at **26-27 (S.D.N.Y. Aug. 22, 2003) (considering fact that employer and employee both members of same protected class as evidence that no discrimination occurred).

Fourth, even assuming O'Neill told plaintiffs that they would never be promoted, there is nothing in the record to suggest that this was based on a discriminatory animus. The record clearly reveals that O'Neill had a negative opinion of plaintiffs as supervisors, but the stated reason for O'Neill's opinion is non-discriminatory. O'Neill has stated, under oath, that the reason he did not believe plaintiffs were supervisor material is because he subjectively believed, based on working with plaintiffs over a number of years, that they lacked initiative. O'Neill was entitled to make promotion decisions based on subjective criteria. See Byrnie v. Town of Cromwell Bd. of Educ., 243 F.3d 93, 105 (2d Cir. 2001). Plaintiffs contend that O'Neill was motivated instead by discrimination, but they point to no evidence to support that speculation.

Fifth, the make-up of the Crime Lab is inconsistent with plaintiffs' notion of a workplace run by individuals biased against the foreign-born. The Crime Lab was extremely diverse, and Johnson and Hickey were the first Caucasian, male, and United States-born Criminalist IVs. At that point, even with their addition, seven of the nine Criminalist IVs were foreign-born. Three more Crime Lab employees were promoted to Criminalist IV

after them, and only one was a white male born in the United
States.  The other two were women -- one African-American and one
born in Guyana.

Sixth, plaintiffs' claim of discrimination does not
make sense.  Plaintiffs do not share a single race, national
origin, or gender, and thus it is not clear what they claim
motivated what they regard as discriminatory decisions.  Perhaps
their theory is that O'Neill did not like Egyptians, or Indians,
or women, but plaintiffs have not submitted any evidence to show
that animus toward one of these groups is what motivated him.
Instead, they generally allege that he must have been biased
against foreigners -- ignoring the fact that O'Neill is himself
foreign-born, and most of the Criminalist IVs were also foreign-
born.

At the end of the day plaintiffs have not submitted
evidence sufficient to defeat summary judgment.  See James, 233
F.3d at 157.  Plaintiffs effectively ask this Court to speculate
that because two Caucasian, American-born men were promoted over
four non-Caucasian, foreign-born employees then, ipso facto, the
promotion decision must have been based on discrimination.
Without evidence of discrimination, however, this is merely
speculation, and speculation is not sufficient to defeat summary
judgment.  See Kulak v. City of New York, 88 F.3d 63, 71 (2d Cir.
1996) ("Though we must accept as true the allegations of the
party defending against the summary judgment motion, drawing all
reasonable inferences in his favor, conclusory statements,

conjecture, or speculation by the party resisting the motion will not defeat summary judgment.") (citations omitted).

Plaintiffs' primary argument -- aside from the fact of the promotions -- seems to be based on the fact that discrimination must have played a role in the promotions because plaintiffs had more seniority than the employees ultimately promoted. There is, however, no legal requirement that an employer base promotional decisions solely on seniority, even if, as plaintiffs seem to suggest, seniority is the best gauge of an employee's abilities and effectiveness. As the Second Circuit has held, when considering a defendant's articulated reason for an adverse employment decision, "the reasons tendered need not be well-advised, but merely truthful." Dister v. Cont'l Group, Inc., 859 F.2d 1108, 1116 (2d Cir. 1988).

### b.  Demotion

I assume for purposes of this motion that plaintiffs have made a prima facie showing of discrimination on the basis of race, national origin, and gender. Defendants have met their burden of articulating a non-discriminatory reason for their demotion[13] of plaintiffs. See Stratton, 132 F.3d at 879; see also Reeves 530 U.S. at 142-43. Simply put, defendants contend

---

[13]     Defendants vigorously dispute that plaintiffs were demoted in May 2005, and instead argue that it was a mere re-classification. As noted, however, I assume for the purposes of this motion that plaintiffs has satisfied the requirement that they suffered an adverse employment action.

that they reclassified plaintiffs' positions in 2005 because
there was a sufficient span of control ratio in CSAS.

Accordingly, I proceed directly to the ultimate
question of whether plaintiffs have presented sufficient evidence
from which a reasonable jury could find that they were
discriminated against because of their race, national origin, and
gender.  I do so by evaluating first plaintiffs' evidence, then
defendants' evidence, and finally the record as a whole, keeping
in mind the elusiveness of proof of discrimination and the
principle that the jury is "entitled to view the evidence as a
whole."  Stern v. Trs. of Columbia Univ., 131 F.3d 305, 314 (2d
Cir. 1997); see also Siano v. Haber, 40 F. Supp. 2d 516, 520
(S.D.N.Y.), aff'd mem., 201 F.3d 432 (2d Cir. 1999).

### i.  **Plaintiffs' Evidence**

Plaintiffs offer the following additional evidence in
support of their demotion claim:

First, after the promotions of Hickey and Johnson,
there were five Criminalist III-Supervisors, none of whom were
Caucasian or born in the United States.  All were demoted.

Second, as discussed above, O'Neill made it known that
plaintiffs would never be supervisors.

### ii.  **Defendants' Evidence**

Defendants offer the following additional evidence in
support of their motion for summary judgment:

First, they reclassified all Criminalist III-
Supervisors -- including Casella, who had a doctorate and who had

been O'Neill's first choice for the Criminalist IV position -- and did not single plaintiffs out.

Second, O'Neill, who made the decision to reclassify plaintiffs, was also foreign-born.

### iii.  The Record As a Whole

Considering the record as a whole, and resolving all conflicts in evidence and drawing all reasonable inferences in plaintiff's favor, I conclude that no reasonable jury could find that plaintiffs' race, national origin, or gender were motivating factors in their demotion.

For many of the same reasons discussed above -- which I incorporate by reference -- there is simply insufficient evidence of discrimination for plaintiffs to reach a jury.  When O'Neill reclassified the Criminalist III-Supervisors in 2005, he also "demoted" Casella, who had been his first choice for a Criminalist IV position.  This belies the notion that O'Neill's reclassification decision was driven by animus toward plaintiffs. Moreover, considering the big picture, the allegations plaintiffs make are inconsistent with the diverse nature of the Crime Lab's work force.  A conclusion that plaintiffs were demoted because of their race, national origin, or gender would be based on speculation, and, as discussed above, speculation about possible discriminatory motives is insufficient to defeat a motion for summary judgment.

### c.  **Retaliation**

Plaintiffs asserted a claim for retaliation in their second amended complaint.  Defendants moved for summary judgment on this claim, devoting five pages of their brief to it.  (Defs. Mem. at 33-38).  In their opposition, plaintiffs do not address the claim at all, and it is therefore deemed abandoned.  See Di Giovanna v. Beth Isr. Med. Ctr., No. 08 Civ. 02750 (LAK), 2009 U.S. Dist. LEXIS 80990, at **37-38 n.108 (S.D.N.Y. Sept. 8, 2009) (citing cases for proposition that plaintiff's failure to respond to argument made in summary judgment brief constitutes abandonment of claim).

### C.  **Plaintiffs' Due Process Claim Under 42 U.S.C. § 1983**

Plaintiffs asserted a claim for violation of due process in their second amended complaint.  Defendants moved for summary judgement on this claim, devoting two pages of their brief to it.  (Defs. Mem. at 32-33).  In their opposition, plaintiffs do not address the claim at all, and it is therefore deemed abandoned.  See Di Giovanna, 2009 U.S. Dist. LEXIS 80990 at **37-38 n.108.

### D.  **Plaintiffs' Monell Claim**

Because I have concluded that no reasonable jury could conclude that defendants discriminated against plaintiffs, their claim against the City under Monell is dismissed.  See Doe v. Smith, 704 F. Supp. 1177, 1188 (S.D.N.Y. 1988) ("[T]here can be no municipal liability where no constitutional violations are

found to have occurred."); <u>Vassallo v. Lando</u>, 591 F. Supp. 2d
172, 202 (E.D.N.Y. 2008) (holding that "no <u>Monell</u> claim can lie"
where court finds no constitutional violation).

## E.  **Plaintiffs' New York Labor Law Claim**

Plaintiffs, in their response to defendants' summary
judgment motion, cross-move for summary judgment on their claim
for compensation under New York Labor Law § 190 <u>et seq</u>.  As
defendants point out in their motion, however, government
agencies such as the NYPD are exempt from the New York Labor Law.
<u>See</u> N.Y. Labor Law § 190(3) ("The term 'employer' shall not
include a governmental agency."); <u>Mancuso v. Crew</u>, 255 A.D.2d
295, 296 (2d Dep't 1998) (noting that government agencies are
exempt from law).  Plaintiffs do not even address this point in
their opposition, but instead set forth three pages of irrelevant
boilerplate on affirmative defenses.[14]  As the law is clear that
defendants are exempt from the New York Labor Law, defendants'
motion for summary judgment as to these claims is granted, and
plaintiffs' cross-motion is denied.

### CONCLUSION

For the foregoing reasons, defendants' motion for
summary judgment is granted, plaintiffs' cross-motion is denied,
and the complaint is dismissed, with prejudice and with costs,

---

[14]    To the extent that plaintiffs believe that defendants'
argument that the NYPD is exempt from the Labor Law is an
affirmative defense, it is not.  It is a defense, as it
constitutes defendants' "stated reason why the plaintiff or
prosecutor has no valid case."  <u>See</u> Black's Law Dictionary 430
(8th ed. 2004).

but without attorneys' fees.  The Clerk of Court is directed to enter judgment accordingly and to close the case.

        SO ORDERED.

Dated:    New York, New York
        September 18, 2009

                                        DENNY CHIN
                                        United States District Judge